IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NICOLE MOYER :
415 Fairway Drive :
Etters, PA 17319 :
:
Plaintiff, :
v. : :
:
THE COMMONWEALTH OF :
PENNSYLVANIA, :
:
THE PA. DEPARTMENT OF :
GENERAL SERVICES :
: COMPLAINT IN CIVIL ACTION
DGS SECRETARY, REGGIE MCNEIL :
:
DGS DEPUTY SECRETARY OF :
ADMINISTRATION AND REAL ESTATE: **JURY TRIAL DEMANDED**
CATHERINE CALIFANO :
:
DGS DEPUTY SECRETARY CAPITAL :
PROGRAMS & (PREVIOUSLY ACTING) :
FACILITIES AND PUBLIC SAFETY :
GREG KIRK :
:
DGS DEPUTY SECRETARY FOR :
ENTERPRISE OPERATIONS AND :
PROCUREMENT, FRANK :
MCNALLY :
:
EXECUTIVE RESIDENCE DIRECTOR, :
CLAIRE RAMSAY :
:
DIRECTOR- FINANCE & RISK MGMT, :
KRISTINA LANDVATER :
:
FINANCE AND RISK MANAGEMENT, :
PROCUREMENT DIVISION CHIEF, :
MICHAEL WEGES :
:
JOHN & JANE DOES #1-#10, :
:
c/o Governor Josh Shapiro :
501 North Third Street :

508 Main Capitol Building :
Harrisburg, PA 17120 :
:
Defendants :

---

:

**COMPLAINT – CIVIL ACTION**

COMES NOW, NICOLE MOYER ("Plaintiff") through her lawyers, Mark D. Schwartz, Esq and Lorraine C. Harmer, Esquire of Harmer Law Firm, LLC who represents as follows.

INTRODUCTION- SUMMARY OF CLAIMS

1. This action arises as a result of The Commonwealth of Pennsylvania's (the "Commonwealth"), specifically the Pennsylvania Department of General Services ("DGS") and the other named defendants acting under color of law in retaliating against and ultimately firing Plaintiff as a result of her exercising speech protected under the First Amendment and 42 USC Section 1983, which provides for a civil action against persons named each in their individual capacities for depriving her of protected rights including the right of free speech. Furthermore, case law found at *Ex Parte Young*, 209 U.S. 123 (1908) provides for seeking prospective relief against a state official in his or her official capacity. In this case, the named individual defendants, ultimately responsible to Governor Shapiro for upholding the law and the proper administration of Commonwealth departments and employees, are sought to be enjoined from allowing the ongoing violations of state and federal constitutional law that Plaintiff alleges has taken place by and within the Shapiro administration, specifically when it comes to procurement practices. While ultimate responsibility lies with the Governor, sufficient facts are as yet unknown so as to assert 1983 liability personally against him.

2. Second, this action also arises out of Plaintiff's reports to her superiors and others

of waste and wrongdoing, including fraud in terms of waiving applicable procurement requirements, which ultimately resulted in unlawful retaliation against her by DGS and other named defendants that have included willfully, ignoring Plaintiff's reports of waste and wrongdoing and ultimately firing her. Accordingly, Plaintiff brings this action pursuant to the Pennsylvania Whistleblower Law, which was specifically enacted by the Commonwealth of Pennsylvania to prohibit precisely the kind of unlawful and retaliatory employer conduct and actions that the Commonwealth and its DGS has taken against Plaintiff.

THE PARTIES

3. Plaintiff, NICOLE MOYER, an adult female who resides at 415 Fairway Drive, Etters, PA 17319 has spent her entire career in procurement, first as a US Army Supply Specialist, then from July 2009 through April 2022 working for Defendant in the Procurement sector within the PA Department of Transportation (PennDOT), Department of General Services'(DGS), Bureau of Publications (Pubs), DGS, Bureau of Procurement (BOP), followed by more procurement work in the Commonwealth's Department of Labor and Industry from April 2022 through December, 2023, and finally working for the Commonwealth's DGS, Bureau of Finance and Risk Management (FARM) as a Procurement Specialist 3 section from December of 2023 until her abrupt firing devoid of an explanation on March 24, 2026.

4. **PURPOSELY LEFT BLANK**

5. Defendants THE COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF GENERAL SERVICES, SECRETARY OF GENERAL SERVICES REGGIE MCNEIL, DEPUTY SECRETARY CATHERINE CALIFANO, DEPUTY SECRETARY GREG KIRK, DEPUTY SECRETARY FRANK MCNALLY, EXECUTIVE RESIDENCE DIRECTOR CLAIRE RAMSAY, FINANCE AND RISK MANAGEMENT ("FARM") DIRECTOR,

KRISTINA LANDVATER, AND FARM PROCUREMENT DIVISION CHIEF, MICHAEL WEGES, together with various JOHN and JANE DOEs, in various capacities, are legally liable to Plaintiff given their deliberate failure to exercise their affirmative governmental responsibilities in following and carrying out the above-referenced laws, violating those laws, and illegally retaliating against Plaintiff, finally culminating in her deliberate firing.
This retaliation all came after Plaintiff, repeatedly reported to superiors alleged procurement irregularities, waste of taxpayer funds, favoritism, abuse of waiver procedures, and potential wrongdoing within DGS.

6. Defendant THE COMMONWEALTH OF PENNSYLVANIA ("the Commonwealth" or "Defendant Commonwealth") is a state government entity, corporate and politic, which has been a member state of the union, known as the "United States of America" since ratifying the U.S. Constitution on December 12, 1787. At all times pertinent, it has been Plaintiff's employer and is headquartered at 501 North Third Street, 508 Main Capitol Building, Harrisburg, PA 17120, at all times relevant hereto, Defendant Commonwealth acted through its officers, agents, servants and employees who, cloaked with governmental authority, were purportedly acting under color of law within the course and scope of their Commonwealth employment when it came to Plaintiff. The Defendant Commonwealth is meant to expressly include offices and departments in the Executive Branch all under Governor Shapiro's control, including but not limited to Defendant, PENNSYLVANIA DEPARTMENT OF GENERAL SERVICES ("DGS").

## FULFILLMENT OF CONDITIONS PRECEDENT

7. Plaintiff has fulfilled any and all conditions precedent to the institution of this action under Federal and State law having served notice to Pennsylvania General Counsel Selber.

JURISDICTION & VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this is a civil action arising under Federal law.

9. Plaintiff also invokes the supplemental jurisdiction of this Court over her related claims arising under state law pursuant to 28 U.S.C. §1367(a), all of which are so related to the federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

10. Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b) and (c), since both Plaintiff and Defendants reside and do business in the Middle District of Pennsylvania, and since the events giving rise to Plaintiff's claim occurred in the Middle District of Pennsylvania.

FACTUAL ASSERTIONS

11. Plaintiff is an adult female, presently 49 years of age born on December 14, 1976. After graduating from high school in 1994 she entered the military in 1995 and commenced her career in procurement, serving in the U. S. Army as a Supply Specialist. She subsequently began her career with the Commonwealth of Pennsylvania's Pennsylvania State Police (PSP) in 2005 and worked for the PA Department of Education (PDE), and then was hired as a Purchasing Agent at PA Department of Transportation, worked as an Administrative Officer for Department of General Services (DGS), Bureau of Publications (Pubs) before transitioning to the Department of General Services (DGS), Bureau of Procurement (BOP) in July, 2009. She became certified as a Pennsylvania Commodity Specialist in December of 2009. Her responsibilities included constructing, managing, and monitoring multiple service contracts for the Commonwealth, preparing correspondence and written procedures for contract usage, as well as communicating

with internal and external Commonwealth customers in reference to contracts. She also was tasked to initiate and manage Invitation to Qualify (ITQ) contracts. She communicated with internal and external Commonwealth customers, maintained a positive working relationship all, including Legal and Comptroller's Office as to facilitate fiscal and administrative matters relating to contract process and expenditures. In April of 2022, she proceeded to work in the Commonwealth's Department of Labor & Industry under the Department's Procurement Director. Her responsibilities included supporting multiple bureaus with their varied service and material procurements and also working with evaluation committees. In December of 2023, she was hired to support Finance and Risk Management (FARM) as well as a host of other DGS bureaus that included, but not limited to: Commonwealth Media Services (CMS), the Bureau of Supplies and Surplus (BSSO), Capitol Police Department (CPD), Bureau of Publications (Pubs), Bureau of Real Estate (BRE), Bureau of Facilities Management (BFM), Energy Resource Energy Resource Management (ERMO), the Governor's Official Residence and the office of Business Inclusion & Supplier Development (BISD). She developed the Statement of Work (SOW) and Specification documents for Request for Information (RFI's), Invitation for Bid (IFB), Request for Quotes (RFQ's) and Request for Proposal (RFP's), as required. She identified the process and procedure requirements for procurement types based on dollar thresholds, and then worked to issue the public or restricted solicitation(s). She also led evaluation committees, guiding them to understand their roles and duties, managed the timelines to ensure timely processing and then subsequently processing contract award appropriately. She was responsible for entering Emergency procurements and sole source requests, as necessary, and working with all program and IT personnel. She worked with current suppliers and new suppliers for various needs

including vendor registration, vendor replication, DGS Small Business (SB) self-certification, Supplier Relationship Management (SRM) registration, and JAGGAER pre-qualification.

12. According to the DGS website, "We provide shared services to support the business operations of all agencies of the Commonwealth of Pennsylvania." Under "**Overview**" it states "Our mission is to help government operate more efficiently, effectively, and safely-delivering exceptional value for all Pennsylvanians." Under "**Programs and Services"** the following statement is made: "The Pennsylvania Department of General Services provides essential services that support the daily operations and infrastructure of state government. DGS manages state-owned buildings, oversees- construction projects, and procures goods and services, while promoting small, diverse, and veteran-owned businesses through initiatives that create opportunities for these businesses to compete for state contracts. The department also manages the state's real estate portfolio, fleet, and surplus property to ensure the efficient use of public resources…."

13. Plaintiff came to understand that the DGS, particularly under the leadership of Governor Shapiro was neither fulfilling the statements quoted above, nor fulfilling its affirmative legal obligations when it came to procurement, particularly with respect to letting post-fire contracts with respect to the Governor's Official Residence, as well as other projects. As a result of her complaints about the need to follow pertinent procedures, Plaintiff was fired on March 24, 2026.

REQUIREMENTS ASSOCIATED WITH JOB TITLE PROCUREMENT SPECIALIST 3

14. The Commonwealth publishes on its website a description of requirements associated with the job title "Procurement Specialist 3", describing "professional work in strategically sourcing and procuring goods and services, negotiating and administering related

contracts and implementing corrective actions for non-compliance." The description defines the position's "DISTINGUISHING CHARACTERISTICS" by stating that "Non-supervisory work at this level is differentiated from the lower level jobs based on the development, negotiation, and execution of highly complex contracts and other procurements that typically involve statewide scope or coordination among multiple entities and programs, multi-million dollar service agreements; high visibility and political sensitivity, extensive legislative and policy considerations, and significant impact on the agency mission or the health, safety, and well-being of the public." Required entry level knowledge of the position is "Knowledge of procurement principles and best practices."

15. At all times, Plaintiff has attempted to comply with the applicable requirements and insist upon best practices being followed, the end result of which was her being fired.

PROCUREMENT FRAMEWORK

16. Plaintiff's and Defendants' duties required adherence to Commonwealth procurement requirements. The normal process required: identification of need; preparation of specifications or statements of work; determination of contract availability; cost estimation; solicitation type identification; competitive procurement where required; evaluation; award; and contract administration.

17. Pennsylvania maintains a Procurement Handbook (the "Handbook") providing information on the policies, procedures, and guidelines for the procurement of materials, services, and construction under the authority of the Commonwealth's Procurement Code. The Handbook can be found at https://www.pa.gov/agencies/dgs/procurement-resources/procurement-handbook#accordion-93297fc0e4-item-640ac85db7. The required process for procurement is as follows:

First, identify the service or material needed.

Second, construct a Statement of Work (SOW) for services or a Specification for materials to include all specific needs, any pertinent phase/milestone requirements, delivery location, and any other additional requirements. The document should answer the who/what/when/where particulars.

Third, identify whether there a current contract available? If so, then follow the contract, requesting a formal quote and identify the procurement based on cost estimate. If no contract exists, identify the appropriate solicitation type based on initial term dollar threshold. If the cost of the initial term is more than ten thousand dollars ($10,000.00) and there is no contract, a solicitation must be issued. If contract, but not the specific "type" (manufacturer/distributor), then enter a waiver request and administer the alternate procurement according to the estimated dollar spend. A waiver is appropriate after the process has been exhausted.

Fourth, determine whether initial term spend is over two hundred fifty thousand dollars ($250,000.00) to warrant Goal Setting. If yes, then issue the request to Office of Bureau Inclusion Supplier Development (BISD) and unless Goal Setting is waived under limited circumstances, apply and issue the solicitation (Invitation for Bid (IFB)/Request for Quote (RFQ) or Request for Proposal (RFP)).

Fifth, based on procurement type, either award to a responsive/responsible supplier based on cost or if evaluated, process individual and group scoring, assess cost points and award based on overall score.

Sixth, manage/renew/reissue procurement, as necessary.

18. Prior to a waiver being issued, there are steps in the above ¶17 Procurement process must be followed. When a waiver is warranted, an online waiver request must be submitted by Plaintiff to be routed to the appropriate Commodity Specialist for their review and approval.

19. Core principles applicable to Plaintiff's experience built upon non-negotiable rules as follows:

-1. Competition is Mandatory with the goal of maximizing protection of taxpayer funds.

-2. Advance Approval & Documentation is Required

All procurements must be: planned, documented, and approved before execution.

-3. Mandatory Use of Existing Contracts

Existing contracts must be used unless a valid, documented waiver is approved after the required steps are followed, not in advance, as in many instances.

-4. Separation of Roles

Only authorized procurement professionals may draft solicitations and/or approve procurements. Program staff cannot control vendor selection.

-5. Transparency & Auditability

Every procurement must be traceable and withstand audit scrutiny.

20. During her experience at DGS Plaintiff has questioned and witnessed the following:

a. Waiver Process Violations. Waivers must: include proper justification and be submitted and approved in advance by the appropriate Commodity Specialist.

Instead, Plaintiff has witnessed a fundamental and frequent breakdown and violation of the waiver process with the issuance of waivers followed by later paperwork, the issuance of waivers after procurement were completed, with non-procurement staff entering waivers.

b. Existing Contract Bypass. This rule requires that, if a contract exists, it must be used.

In Plaintiff's experience, items were purchased despite the availability of contracted vendors who were clearly available, but instead ignored this policy violation made for the use of higher cost alternatives resulting in waste and policy violation.

c. Improper Use of ITQ (Invitation to Qualify). The ITQ process allows for limited competition among prequalified vendors so long as they are prequalified and they stay within dollar thresholds.

In Plaintiff's experience some vendors were not prequalified for the specific Invitation to Qualify (ITQ) and the ITQs were artificially priced via threshold manipulations, such as splitting the procurement, to avoid the threshold of $50,000, above which bidding would be required.

For example, when it came to fire suppression equipment for the Governor's Official Residence, an RFQ and ITQ should have been issued as multiple phases were known. Fire suppression equipment was ultimately purchased and wired/installed subsequently using Corl Communications. There was an initial phase, under the $50k ITQ allowance. However, the second phase exceeded the $50k threshold and resulted in a waiver request that was granted to

Corl Communications by DGS, Bureau of Procurement. The correct process would have been to identify a complete Statement of Work (SOW) and have pricing identified for the complete job. This process was not followed.

d. Violation of Requirement of Statement of Work (SOW) for service or material procurements. Every procurement must begin with a clear SOW or Specification with clear requirements. DGS, not the vendor, is to define the scope and prepare the SOW or Specification.

In Plaintiff's experience, projects were initiated without a SOW. Vendor proposals were created before the existence of a SOW or Specification. Moreover, procurements were improperly reverse-engineered with a decision first made and required paperwork following later.

e. Prohibition on Vendor Preselection. Vendors cannot be selected before going the procurement process or otherwise be given an inside advantage.

In Plaintiff's experience she has observed that vendors were identified before the procurement process began, with specifications being tailored for preferred vendors. Plaintiff also experienced and observed political and DGS management pressure to select certain vendors, resulting in a total loss of competitive neutrality.

f. Restrictive Specifications. Applicable rules require that specifications be tailored to promote competition as opposed to restricting competition by means such as having a brand-specific bias.

Instead, Plaintiff repeatedly observed and complained about improper restrictive specifications tied to specific suppliers.

g. P-Card and Payment Controls. The P-Card is a DGS credit card limited to small purchases of ten thousand dollars ($10,000.00) or less per quarter. PayPal is not an approved payment system.

Nonetheless Plaintiff learned that PayPal was used by DGS and that the P-Card was used for split purchases where items costing more than ten thousand dollars ($10,000.00) would be split, so as to qualify for payment. These methods were improperly used to circumvent procurement controls and Plaintiff criticized these practices.

h. Right of First Refusal (Unique Source) Certain vendors (e.g., UniqueSource Products & Unique Source vendors are deemed to have priority

Nonetheless, Plaintiff observed them being bypassed altogether or inadequately engaged, resulting in a failure to comply with mandatory priority sourcing.

i. Procurement Authority . Only procurement officials may approve procurements or issue waivers. Program staff cannot override procurement requirements.

Instead, Plaintiff has complained that unqualified Deputy Directors and program staff instead controlled certain procurements. Non-procurement personnel would issue waivers, rending procurement decisions ultra vires.

j. Contract Formation & Execution Requirements. No work may begin until a contract is executed and a Purchase Order (PO) or other payment mechanism is issued.

Instead, Plaintiff has observed and complained of work being performed before the procurement process was completed and where vendors were engaged pre-contract making for an unauthorized commitment of public funds.

k. Waste & Fiscal Stewardship. The procurement process must ensure the best value and avoidance of waste.

Instead, Plaintiff has witnessed and complained about paying for unused services, duplicate purchases and the utilization of overpriced alternatives. These practices represent a clear violation of the core fiscal responsibility mandate.

21. While some might claim that the issuance of waivers is an exemption from the procurement process entirely, in actuality, before a waiver can be considered, procurement personnel are required to identify the service or material, determine contract applicability, prepare justification, submit the request for review, and obtain approval before procurement activity occurs. Plaintiff alleges that she has raised problems with multiple Governor's Official Residence procurements and a procurement for the Main Capitol Building that bypassed these requirements.

22. Moreover, in a meeting with other DGS officials Plaintiff learned that services were being provided for security for private residences. Others at the meeting were less than forthcoming when it came to Plaintiff's questions and Plaintiff was eventually told not to ask questions, being fired soon thereafter. Plaintiff's concerns were later validated by the Pennsylvania State Treasurer who opined that DGS had no legal authority whatsoever to pass upon or approve procurements for those private residences.

23. In sum, as outlined below with respect to procurements for the Governor's Official Residence, the Main Capitol Building, and certain private residences Plaintiff has witnessed and protested not simply isolated or technical violations, but the violation of core-non discretionary rules, evidencing a systemic breakdown of public procurement integrity.

24. By way of another example, the Handbook requires pre-approval for procurements. Instead, it has been Plaintiff's experience that, post-hoc justifications have been made for work actually done before any pre-approval.

25. Finally, the issuance of waivers has been abused, resulting in over-priced, non-competitive procurement and the use of unqualified vendors and the most fundamental waste of taxpayer funds. While DGS is supposed to be independent, Plaintiff has observed personal and political preferences being honored, such that procurement professionals like Plaintiff are sidelined. Plaintiff repeatedly reported concerns that waivers were being granted after purchases occurred, that non-procurement personnel were directing procurement decisions, that favored vendors who were being selected before competitive processes occurred, and that taxpayer funds were being wasted as a result.

**DETAILED FACTUAL CHRONOLOGY**

26. On January 17, 2023, Josh Shapiro began his first term as Governor of Defendant Commonwealth and overseer of Commonwealth agencies, including Defendant DGS.

27. On February 1, 2023, Governor Shapiro nominated Defendant Reggie McNeil to serve as his DGS Secretary. Defendant McNeil was confirmed for the position on June 7, 2023 by the Pennsylvania Senate and has since been serving in such capacity. Despite his resignation effective July 31,2026, at all times pertinent to this lawsuit Defendant McNeill remained Secretary of DGS, through Plaintiff's firing. Together, with the other deputies and employees

named as individual Defendants herein, he is responsible for the faithful adherence to procurement laws and practices by the Commonwealth and DGS.

28. On December 18, 2023, Plaintiff returned to DGS and was placed in The Bureau of Finance and Risk Management ("FARM") as a Procurement Specialist 3. Plaintiff's responsibilities included procurement oversight, solicitations, contract administration, vendor qualification, preparation of Requests for Quotes ("RFQs"), Requests for Proposals, ("RFPs"), Invitation for Bids ("IFBs"), and compliance review for procurement for numerous Commonwealth agencies and bureaus.

MATTERS PERTAINING TO THE GOVERNOR'S OFFICIAL RESIDENCE

29. On April 13, 2025 an intruder, intent on killing Governor Shapiro, used Molotov cocktails to set a fire to the Governor's Official Residence located at 2035 North Front Street, Harrisburg, PA 17102 (the "Official Residence"). This was calculatedly done during the Passover holiday when a host of Governor's family and friends were staying there. The Official Residence is one of at least two (2) residences used by Governor Shapiro and his family. It is maintained by the Commonwealth of Pennsylvania, specifically DGS and has traditionally been funded by taxpayers.

30. Prior to the fire, Plaintiff had access to converse with suppliers regarding services and material procurements with respect to the Official Residence. . When she was first hired for FARM, when it came to the Official Residence, she was encouraged to reach out to bureau contacts for service/material information, current contract specifics, required details, historical use and spend data. This changed. After the fire, Plaintiff felt that she could no longer have such conversations or ask questions openly with respect to the Official Residence. Everything became

secretive and information was not freely shared. Moreover, she found that information that she did receive was vetted

31. The lead representative for the Official Residence, specifically Claire Ramsay, often provided incomplete information or late information. Requests for information would often not be responded to. The only thing pre- and post- fire was that was consistent was the lack of information coming from Ms. Ramsey, her lack of understanding of procurement requirements, and frankly her disregard for such requirements. Plaintiff was excluded from meetings. Ms. Ramsey, who appeared to be under pressure, would act outside of the procurement process and then DGS would have to clean things up afterwards so as to appear to be compliant.

32. Upon information and belief, pre-fire and post-fire, the Governor's wife, and presumably Governor Shapiro, selected and presumably worked with a high-end New York City interior designer, the De La Torre Design Studio. (the "Interior Designer"). The Interior Designer's website boasts, doing the interiors of the most high-end penthouses, estates, and yachts and even airplanes in the toniest of locales. Not highlighted in its website is its work for the Official Residence, paid for by Team Pennsylvania, a Harrisburg-based non-profit that reportedly keeps its donor names secret, despite managing several funds that benefit the Governor, his family, or his office. This has been criticized as a slush fund for Governor Shapiro's use, criticized by ethics experts.

33. Approximately six months post-fire, reporters Angela Couloumbis and Vincent DiFonzo of *Spotlight PA* authored a piece on September 11, 2025 entitled "Taxpayers billed $6 million for arson-related repairs to governor's mansion, but Shapiro admin withholds full details." The piece claims that "Despite using taxpayer money, state officials are shielding information about nearly a quarter of those expenses ($1.5 million of $6 million) – including

who was paid and exactly what the money was spent on." Moreover, Spotlight claims that some invoices listing the names of the contractor and the goods provided were blacked out. The Shapiro administration perversely contended that disclosing the information would precipitate further physical harm. Shapiro spokesman Manuel Bonder claimed, notwithstanding that "This work is being done diligently and with a clear focus on saving taxpayer dollars."

34. Following the Official Residence fire, when it came to related procurement projects undertaken, Plaintiff observed repeated departures from procurement requirements. She raised concerns regarding: (1) flooring procurements; (2) wallpaper procurements; (3) lighting procurements; (5) security and monitoring procurements; (6) HVAC services; (7) consultant contracts; (8) furniture standardization projects; and (9) questionable resort to procurement-card expenditures.

<u>Flooring Procurement and Installation at the Official Residence</u>

35. Plaintiff was initially contacted by Cody McCahan, Residence Maintenance Repairman, towards the middle or end of February 2026. An email outlined that Mike Hurrell, McCahan's predecessor, had coordinated the purchase and installation of carpet with the firm "Harrisburg Wall & Flooring" for an approximate cost of seventeen thousand dollars ($17,000.00).

36. Procurement Specialist 2, Terri Parry, and Plaintiff subsequently had a discussion with Judd Bentz, a representative from Harrisburg Wall & Flooring who confirmed that the materials had been purchased and that install services were partially complete. However, Harrisburg Wall and Flooring was not approved nor contracted for when it came to the carpet purchase or installation.

37. Plaintiff and Parry later discussed this flooring matter with their superior, Kristina Landvater, FARM Director, who in turn recommended conferring with Kelly Martini, DGS's Chief Procurement Officer. Parry and Plaintiff had a discussion with Ms. Martini, who stated that two (2) waivers should be issued after the fact: – (1) to purchase outside the carpet contract from Harrisburg Wall and Flooring and (2) to purchase installation services from Harrisburg Wall and Flooring.

38. Had the process been conducted properly, it would have been first to identify whether or not the carpet was available on the existing Carpet, Resilient Flooring & Installation contract # 4400029078. If the required manufacturer or type was not available, then a waiver should have been sought in advance of the carpet purchase. Then for installation, UniqueSource, should have been given the right of first refusal.as required. UniqueSource is a private non-profit corporation with its primary focus of advancing employment opportunities for Pennsylvanians with disabilities. In accordance with Section 520 of the Pennsylvania Procurement Code, it connects Commonwealth procurement offices with its member network of social enterprises who provide an array of products and services. In turn, should UniqueSource not opt to perform the carpet's installation, a solicitation for installation services should have been issued. However, this improper issuance of a waiver was Kelly Martini's and DGS's attempt to "clean up" what had already been improperly done.

39. With the waiver(s) having been processed, Plaintiff had a separate conversation with DGS employee Margaret (Peggy) Beckley about this. In turn Peggy Beckley subsequently had a conversation about it with Brittany Rossner, Esquire of DGS, Legal, who advised Beckley that a waiver(s) should not have been permitted in this instance. Further, Ms. Beckley told

Plaintiff that she was questioned by Kelly Martini as to why she had asked DGS legal about this matter.

40. When Plaintiff complained and inquired about this to her supervisor, Michael Weges, he said something to the effect that "she just was trying to clean things up" as purchases and installation in fact had already occurred before proper descriptions, approvals, and waivers could take place.

41. Most recently, Plaintiff learned that Kelly Martini, reportedly reached out to UniqueSource , preposterously and disingenuously asking whether they wanted to complete the remainder of the carpet install services and if they could finish within two (2) weeks. Plaintiff questions whether Unique Source even had opportunity to view the situation. Plaintiff believes that the two (2) week period of time was simply an attempt by DGS to cover up and save face from improper procurement. However, in the first place, UniqueSource should have been brought in to exercise a right of first refusal before Harrisburg Wall and Flooring was even involved. Upon information and belief, to date, Procurement has not received an invoice or updated information about the completion of the carpet installation.

Wallpaper Procurement and Installation at the Official Residence

42. The wallpaper for the Official Residence, the type and manufacturer of which was specified by the non-contracted interior designer, was initially purchased pre-fire. DGS subsequently amended the "Lumber" category to include "Interior Finishing." By amending this category, the Governor's Official Residence got its preferred supplier without any competition whatsoever.

43. The initial decision, pre-fire, was that the DGS maintenance personnel were to perform the installation. However, when the wallpaper arrived, it was decided that the installation was too much for the DGS personnel. Purportedly the wallpaper purchased was very detailed and required special hanging. The manufacturer outlined a list of qualified installers, and Mitchell Forry Wallcovering was the chosen supplier.

44. Pre-fire, Plaintiff was subsequently tasked to work with the manufacturer's identified installer to create a DGS Small Business (SB) contract in order to issue a purchase order for installation services. A purchase order was created after receiving a quote for eighteen thousand dollars ($18,000.00) from Mitchell Forry Wallcovering, one of the available suppliers listed by the wallpaper manufacturer. Plaintiff's expressed frustration in this instance arose from the circumvention of process/procedures, especially outlining a shortened timeframe for contract and purchase order processing and amending the  amending the ITQ ("Invitation to Qualify") category for lumber to "make things fit," not including Procurement with the information before the fact and then demanding adherence after the fact. This was consistent with DGS's practice of reacting to make things fit after the fact as opposed to proactive compliance.

45. Then post-fire, with the associated damage, the same wallpaper was repurchased at a price tag of forty-nine thousand dollars ($49,000.00) and reinstalled by yet another entity than the pre-fire installer. Ralph E. Jones, Harrisburg, PA installed the wallpaper post-fire. Here too, bidding requirements were avoided thanks to a price of forty-nine thousand dollars ($49,000.00).

46. Plaintiff questioned wallpaper purchases that allegedly resulted in duplicate expenditures before and after the fire. Notwithstanding, there was pressure from those associated

with the Governor's Official Residence, including Defendant Ramsey for DGS to process what was already a fait accompli.

Costly Lighting at the Governor's Residence

47. Pre-fire, in approximately November of 2024, Plaintiff was asked to work with those responsible for the Official Residence, as well as the Governor's Interior Designer, De La Torre Design Studio (which designer had not been contracted with DGS) to procure materials and services for lighting at the Governor's Official Residence in what also turned out to have already been a fait accompli. Brian Esposito, then a DGS Deputy Secretary, allowed for lighting materials purchase and attendant services for lighting only from those suppliers who overlapped the Facilities Maintenance Materials ITQ and the Facilities Maintenance Services ITQ.

48. Plaintiff, along with Terri Parry, Procurement Specialist 2, reviewed necessary supplier systems to identify the overlapping suppliers in November, 2024 for Official Residence lighting. There were three (3) potential suppliers. A specification, provided by De La Torre Design Studio, Governor Shapiro's interior designer, had to be revised for improperly designating a specific brand of lighting that was not on an existing contract. Only one supplier responded to the RFQ, Allegheny City Electric, with a cost of over four hundred fifty-six thousand dollars ($456,000).

49. Plaintiff then attended a meeting with upper management and was told that there was no money available for the quoted cost. She was asked if she could go back to the single respondent and ask for a "Best and Final Offer" (BAFO). The revised costs came back at approximately three hundred eighty thousand dollars ($380,000.00) and Plaintiff was told that there still was not that kind of money for this lighting. DGS personnel advised that it was

discussed that they said we were going to opt to pursue Lowe's or Home Depot and find a solution. This was the last that Plaintiff heard regarding this.

50. Post-fire, Plaintiff did a walk-through to review HVAC and noticed that lighting, with all the tablets and all the upgrades, had been installed, notwithstanding her being previously told that funds were unavailable. DGS Procurement was never tasked to issue a procurement and was not involved with the installation of the lighting. To Plaintiff's knowledge, no competitive procurement was done whatsoever. Moreover, upon information and belief, Plaintiff claims that all of the lighting throughout the Official Residence was not paid for in a way consistent with Commonwealth procurement process or susceptible to an audit. Moreover, a lack of ' coordination between DGS and any insurer involved, together with a lack of receipts, further provided for that lack of audit trail.

<u>Security and Monitoring Procurements at Official Residence & Private Residences</u>

51 When Plaintiff was hired at DGS's FARM bureau, she inherited oversight of the bureau's service contracts. She learned that Vector Security ("Vector") was the supplier that the State Police favored for security monitoring. In fact, a current waiver was then in place to use Vector.

52. Vector's ITQ contract and purchase order were due to expire, along with an existing 5-year waiver to expire in June, 2026.

53. While assisting potential suppliers to pre-qualify for the new Security & Surveillance Preventative Maintenance ITQ contract, in the first quarter of 2026, Plaintiff looked into existing equipment. Plaintiff then learned of the prior installation of the new Genetec

equipment, all without proper procurement authorization. Again, communication from Official Residence personnel was limited or non-existent.

54. Plaintiff then came to question ongoing overlapping and duplicative payments associated with security monitoring contracts with Vector, Berkshire Security, Honeywell, and Genetec.

55. During an initial meeting with the Official s Residence staff, it was disclosed that the Genetec equipment had been installed at the Governor's private residence; the Lt. Governor's private residence, and the regional offices. In addition to presenting the question of whether or not public funds could be spent on private residences, this created additional questions about what equipment existed and where, together with the status of a service agreement for the use of Genetec equipment, and Vector's current role.

56. In a discussion that Plaintiff had with Jeff Smith, a representative of Vector, she learned that, despite Vector's status, it was not included or consulted by IB Abel regarding the Emergency Job Order Contract (JOC), nor was it involved in meetings for discussions of the process, the new equipment to be installed and was not told by representatives of the Official Residence that the existing equipment was being removed. Further Plaintiff learned from the Vector representative that Vector had not been in the Official Residence to do any monitoring of the Honeywell equipment that they had installed since November, 2025.

57. A working group on this proposed that DGS would cover the costs of the monitoring for all locations. However, Plaintiff's supervisor, Michael Weges relayed that Kris Landvater FARM Director, had stated that it was not a good idea due to the auditing of accounts.

Nonetheless, the proposed emergency job order contract that included provision for private residences was processed under the same umbrella as state facilities without bidding.

58. Plaintiff questioned Mr. Weges and Ms. Landvater over the propriety of DGS entering into contracts for security/monitoring services involving private residences, paid for by Pennsylvania taxpayers.

59 Plaintiff was flabbergasted and started asking questions like, "so if they're (Vector) not performing services, then why are we still paying you $10,000 a month to do monitoring?" Afterall, Vector had admitted that it had not been on the premises, since November, 2025, to monitor the Honeywell equipment they had previously installed.

60 . Plaintiff also posed questions about this to her superiors at DGS. For example, Plaintiff had been previously granted authority by Mr. Weges, FARM Procurement Division Director, to call Defendant, Deputy Secretary Frank McNally, who had previously been responsive to Plaintiff's concerns. However, in March, 2026, Plaintiff reached out to Defendant McNally about Vector and posing other security questions as well. This time, Defendant McNally outlined in a MS Team's message to Plaintiff that she needed to go through her chain of command, thus avoiding her.

61. Undaunted, Plaintiff put together a list of questions vetted with her procurement counterpart, Lynn Sube, and sent them to Defendant Weges for review. Within the list of questions, Plaintiff complained that the waiver request was submitted by Katie Weachock, a deputy of Defendant Ramsay's, who had no procurement knowledge or training whatsoever, only to later be approved by Defendant McNally in Berkshire's favor for a cost of two hundred forty thousand dollars ($240,000.00), where a quote was never issued, as confirmed by Paul

Bonargo, a Berkshire representative. Moreover, Berkshire was not pre-qualified for the IT Services ITQ contract, at that time. Subsequently, Defendant Weges let Plaintiff know that Kristina Landvater had shared Plaintiff's questions with Defendant, Deputy Secretary Catherine Califano.

62. The question arises as to where the quoted amount of two hundred forty dollars ($240,000.00) came from. During early 2026, a conversation was had with Brittany Rossner, Esquire, DGS Legal, where Plaintiff voiced her concerns. Incredibly, Attorney Rossner suggested Plaintiff could help the supplier get qualified on the IT services correctly and then Plaintiff could re-issue the waiver. Plaintiff was dumbfounded over this advice, wondering why she should correct a fraudulent waiver. This merely added to Plaintiff's questions and concerns about improper cleaning up of procurement violations.

63. Prior to her firing, Plaintiff received no response whatsoever to her questions and concerns with respect to this.

<u>Bypassing HVAC Service Contract and Ignoring Procurement Categories at the Governor's Official Residence</u>

64. When Plaintiff was hired and placed in DGS's FARM Bureau, she was tasked to construct, maintain, and oversee a variety of service contracts, one of which was the HVAC contract for the Governor's Official Residence.

65. Again, as noted previously, communication with Defendant Claire Ramsay, Official Residence Director proved difficult or non-existent, severely impairing matters. Others at DGS made excuses for Defendant Ramsay's not following the necessary process, saying that no amount of money would be enough to take her job, given that she was under so much stress.

Discovery will reveal whether or not it has been the current occupants of the Governor's Official Residence who made for that stress.

66. In approximately December, 2023,after several emails from Plaintiff to both Defendant Ramsay and Plaintiff's immediate supervisor, Defendant Mike Weges about the Official Residence's HVAC, Plaintiff was told that the Official Residence was "going in a different direction" when it came to HVAC and that they would reach out if or when Plaintiff's services were required.

67. Then, during April 2025, post-fire, there was excavation for a new fence. Plaintiff learned that during servicing, the lines for the geothermal equipment at the Governor's Official Residence had been hit or cut. Plaintiff was told that DGS staff purchased the equipment needed for the fix of the geothermal equipment. Moreover, Plaintiff learned that those responsible at the residence had contacted McClure Company to come and fix the situation despite the fact that their contract had expired. In connection therewith, Plaintiff learned that the HVAC system there had not been serviced for at least a couple of years.

68. Plaintiff also learned that someone from the Official Residence had called McClure Company, which had the contract previously for the excavation, to request that services be provided. McClure Company responded that its contract had expired.

69. Notwithstanding the fact that Plaintiff and FARM had been trying to work with the Official Residence staff for months, Plaintiff was told sometime in September that her services were needed to have immediate HVAC coverage at the Governor's Official Residence. The request was outlined from upper management's former Deputy Secretary for Facilities/Public Safety, Jason Snyder. McLure representatives confirmed to Plaintiff that there

was in fact no coverage. Plaintiff confirmed that she could issue an under fifty thousand dollar ($50,000.00) purchase order with McClure Company for an approximate six (6) month period through December 31, 2025. This would allow a bit of time to proceed through the necessary procurement for a longer period of time. Plaintiff developed a Statement of Work and an Invitation to Qualify ("ITQ") with a Request for Quote ("RFQ") issued from the Facilities Maintenance Services. A purchase order was subsequently issued to McClure company from the ITQ contract for a period of September – December 2025. It was under fifty thousand dollars ($50, 000.00). While the ITQ allowed for work costing less than fifty thousand dollars ($50,000) the Official Residence representatives were at fault for the gap in coverage and the attendant delay.

70. "Guidance" provided by DGS upper management was that the Governor's Official Residence also wanted a "one stop shop," comparable to a management company, such that the residence employees would only have to make a single phone call in the event that there was a need for services at the Official Residence. Plaintiff found this totally contrary to normal procurement protocol, where should problems arise, one would call the supplier of record for the particular HVAC, Plumbing, Water, or Electrical items, separate statutorily-mandated items. However, that was not what was being insisted upon; namely, a single contact to call in the event of any need whatsoever. McClure Company provided this "one stop" during the six (6) month term under their Preventative Maintenance Services contract. That term ended December 31, 2025.

71. Plaintiff was forced to issue a Request for Quotes from the Facilities Maintenance Services' Invitation to Qualify ("ITQ") for a contract, to be awarded January 1, 2026 , wherein she outlined that the Awarded Supplier would be the main point of contact; the "one stop shop."

In turn, the "one stop shop" would subcontract any services that it could not perform. Technically, this was a "pass through" or "overlay," it being clear to Plaintiff that hours would have to be hypothesized to match the contract's quote. Plaintiff expressed her concerns about all of this to her supervisor, Defendant Michael Weges.

72. Plaintiff felt that this "pass through" or "overlay situation" was violative of the state's basic procurement principles and constituted an impermissible waste of public money. The services should have been identified and procured separately either for HVAC, Water Treatment, Electrical, Plumbing, etc. However, those associated with the Official Residence did not want to be bothered with multiple service contracts.

<u>The End Run Concerning the Generator's Acquisition at the Official Residence</u>

73. In accordance with her contract management responsibilities, sometime in February, 2026, Plaintiff learned that the generator at the Governor's Official Residence was due to be replaced.

74. Plaintiff asked about the details for the new, whole house generator and the details necessary for delivery. Plaintiff was told that by DGS Project Manager for Post Fire Services, that a generator had already been ordered and was due to be delivered in March.

75. Plaintiff reached out to members of the Energy Resource Management Office ("ERMO") as well as her own management making inquiries.

76. Plaintiff later learned from a Capitol Programs employee that the existing generator had been removed from the garage to make room for fire suppression equipment, and that a mobile generator had been brought in, with the location of the acquired whole-house

generator yet to be determined. Plaintiff should have been so advised as Penn Power had an existing service contract.

77. The cost of the new generator would have determined the required procurement process to be utilized. Instead, Emergency Job Order Contract ("JOC") monies were used with a chosen supplier selected totally outside of any contract or bidding. Moreover, no information was provided to Plaintiff with respect to updates involving the existing service contract with Penn Power.

78. It was Plaintiff's job to keep the services contracts such as this one updated. Clearly Plaintiff had been bypassed with respect to this generator situation. The question remains as to what other situations bypassed her when it came to her explicit purview and responsibilities when it came to the Governor's Official Residence or elsewhere.

Problems with Attempted Furniture Standards Uniformity

79. Plaintiff was contacted by Tracy Surfield and Kristen Topper of the Bureau of Real Estate ("BRE"), who outlined that they wanted to work with a new supplier to develop furniture standards. Thanks Governor Shapiro's Space Optimization Utilization Project ("SOUP"), the Bureau of Real Estate wanted to identify a subset of preferred styles/colors of furniture such that when visitors arrived in a Commonwealth building, everything would be consistent. This was to be a new service with no existing supplier of record.

80. Notwithstanding this new initiative, there were already in existence commercial furniture contracts managed by Char Riley of DGS's Bureau of Procurement. The contracts were with a multitude of suppliers covering a variety of furniture types used by Commonwealth agencies and schools throughout the Commonwealth.

81. Plaintiff recommended issuing a public Request for Information ("RFI") so that any questions/concerns could be answered that were posed by the existing supplier community. However, Ms. Surfield and Ms. Topper claimed that they did not have the manpower to process this internally and wanted to outsource this RFI.

82. Given that an Invitation for Bids ("IFB") would need to be issued once the furniture specifications were provided, it was a matter for DGS's Bureau of Procurement to issue solicitations for use by multiple agencies. Meetings took place; however, Plaintiff was not invited to attend.

83. Notwithstanding her exclusion, Plaintiff was tasked with constructing a Statement of Work ("SOW") and eventually issue a purchase order to the firm Interior Architects that was under the fifty thousand dollar ($50,000.00) threshold.

84. However, BRE had no conversations with DGS's Bureau of Procurement ("BOP") to identify the plan or requirements for the vendor. BOP had been bypassed. The Plaintiff made contact with both Char Riley, Commodity Specialist, and Adrienne Dickerson, Commodity Manager, to confirm their knowledge of the BRE plan. They had not heard of this information and Adrienne Dickerson stated that she would make Kelly Martini, DGS's Chief Procurement Officer. To Plaintiff's knowledge there was a subsequent meeting with BRE and BOP to finally discuss this. However, Plaintiff was excluded.

85. Soon after Interior Architects began work, Plaintiff was contacted by DGS Commodity Specialist Char Riley letting Plaintiff know that the supplier community was upset as Interior Architects was asking questions about furniture styles/colors and then insisting that

those asked not relay the information to anyone else. Aside from being totally improper, this caused, confusion, disruption and fears of prejudice.

86. The procurement agreement with Interior Architects, was cut short after a payment of approximately forty-nine thousand dollars ($49,000.00), an amount presumably to avoid bidding. There was no further follow through with this project. All the funds that Interior Architects was paid and the guidance provided was unused and waste of time, energy and taxpayer dollars, reflecting a lack of knowledge and application when it came to procurement fundamentals given that there was no initial communication between Bureau of Real Estate ("BRE") and Bureau of Procurement ("BOP"). that led to the time and money waste of having Interior Architects provide and be paid for services that irritated the vendor community. Upon information and belief this has not been implemented, despite payment. As a result, further furniture contracts have been delayed.

Misuse of Commonwealth P-Card

87. DGS personnel may use a charge card called the "P Card" under specific limited circumstances for charges less than or equal to ten thousand dollars ($10,000.00) per quarter. Specific requirements are set forth in Governor's Office Management Directive 310.23 issued on November 6, 2025 consisting of a twelve-page document. DGS is specifically designated to "serve as the contracting officer, as defined by Part I, Chapter 02 of the Pennsylvania Procurement Handbook, for the Program." (at 6. d.) Violations include "splitting a purchase into two Purchasing Card Transactions or between two Cardholders in order to remain below the small, no bid threshold…" (at 5.l.) If the small no bid threshold for materials or service procurements is not met, then "Otherwise, a contract or purchase order is needed for the

purchase." (at 5.m (a)). Moreover, the card is not to be used whatsoever "If the supplier can invoice the Commonwealth after the fact." at 5.o.(1))

88. Plaintiff was contacted by Tina Marks from DGS's Business Inclusion Supplier Development ("BISD"), who because of previous procurement problems, came to rely on Plaintiff for guidance. BISD management, particularly, Defendant McNally, were communicating with a company which identified Pennsylvania businesses as being either "micro" or "midsize." Engaging this company was supposedly in accord with Pennsylvania's goal to do more work with small businesses. Ms. Marks told Plaintiff that Defendant McNally had told her to put associated charges on the Commonwealth "P-card."

89. At the same time, Ms. Marks provided the supplier's proposal/quote to Plaintiff for her review so that Plaintiff could write up a Statement of Work ("SOW"), something which BISD should have prepared previously for a potential supplier. The SOW should have been provided to the potential supplier so that the supplier could offer a proposal and a separate quote. The question remains as to whether or not the supplier was asked if it could invoice the Commonwealth after the fact.

90. The monetary amount coming from that supplier was for approximately nine thousand dollars ($9,000.00), but also listed a cost for additional services approximating two thousand two hundred dollars ($2,200.00).

91. Plaintiff specifically told Ms. Marks not to put this on the P-card because the proposed costs would exceed the P-card allowance. The guidance initially provided by Defendant McNally as to the amount was not correct, nor was the statement to the supplier that it could be paid in advance. Subsequently, a new contract was created, and included terms and

conditions that outlined payment for up to five thousand dollars ($5,000.00). However, the supplier has since requested the cancellation of both the associated contract and purchase order as they understood the process to be paid upfront. This is yet another example of waste.

92. In another instance, Plaintiff learned from Comptroller, Jessie Casner that DGS's Bureau of Publications ("Pubs") and had requested a P-card increase due to a projected threshold overage. In this instance involving publication of "The Pennsylvania Manual" payments were being made impermissibly using the P-Card via PayPal.

93. With respect to the Pubs snafu, Plaintiff was tasked with the cleanup after the fact, reaching out to Pubs's Alison Rooney to have her register as a Commonwealth supplier, self-certify as a DGS small business and provide her documents to secure a DGS Small Business contract so that she could qualify for the services.

94. Given Ms. Rooney's past involvement with Defendant Califano, Plaintiff considered it a conflict for Defendant Califano to allow this situation to have transpired with this past acquaintance who was neither a registered or contracted supplier, and to have not provided a Statement of Work in the first instance.

95. The question remains as to how many other instances of P-Card misusage has occurred and been allowed by the DGS, the department serving as designated "contracting officer" for the P-card program.

<u>The Lactation Pod requested by House and Senate</u>

96. Prior to Plaintiff's or FARM procurement's being so advised of a project, an email was sent from Jeff Stackhouse, Director of the Bureau of Facilities Management, to Kelly Martini, DGS Procurement Chief Procurement Officer with respect to a lactation pod requested

by the Pennsylvania General Assembly. Instead of acting as he did, Stackhouse should have provided the request to DGS, FARM Procurement for research into the matter, instead of reaching out directly to Kelly Martini for a waiver. Initially, there was talk about getting a Mamava product from Grainger via a waiver, as Grainger had a contract. However, no written specification was initially provided, only a brief description and a couple of photos per an that email between Stackhouse and Martini. Purportedly, the email referenced the fact that Martini had already granted a request for waiver for both the contract and the dollar threshold allowance as this was to be the pilot for other Commonwealth facilities. However, DGS could have used the pod from the existing furniture contract and saved money, instead of needlessly wasting it.

97. Ms. Martini directed FARM, Procurement to enter two (2) waiver requests: one, for the dollar threshold allowance (anything over ten thousand dollars ($10,000.00) requires a solicitation) and second, a waiver to allow the pod to be purchased outside of the existing contract.

98. Upon reviewing the aforesaid email with the pod specifics and waiver information, the Plaintiff reached out to both DGS commodity personnel Char Riley and Adrienne Dickerson. Both confirmed that they had no knowledge of the lactation pod purchase. Rather, Chief Procurement Officer Martini had issued the waiver prior to any conversations to discuss and/or identify whether the requested material was already on contract. After learning of this Ms. Riley reached out to the furniture contractors and gained confirmation that there were pods available and on contract, costing significantly less at five thousand dollars ($5,000.00) as opposed to twenty thousand dollars ($20,000.00). She arranged and met with a representative from Bureau of Facilities Management, James Zerby, and the supplier representative from Global on February 19, 2026.

99. A meeting was held on February 19, 2026 attended by James Zerby, Bureau of Facilities Management, Char Riley, DGS, BOP and a representative of Global, focusing on the physical area that the pod would be located in the East Wing of the Capitol. Then the talks moved on to the suggested supplier, Spaceworx Momspace with a cost in excess of twenty thousand dollars ($20,000.00) and the supplier under contract, Global, with a cost of approximately four thousand nine hundred fifty dollars ($4,950.00). The only difference was the Spaceworx having an outer fake "woodgrain" decal for aesthetics. Plaintiff questioned the fact that this pod procurement could be effectuated with a substantially similar product under existing contracts at far lower cost. Plaintiff questioned the rationale for paying substantially more for a minimal aesthetic modification. Plaintiff was overruled.

100. At a subsequent meeting on March 9, 2026 that included House and Senate representatives Ami Sawyer and Ray Whittaker. Plaintiff emphasized that DGS, Publications (Pubs) had the right of first refusal for that type of work and that they would have to be consulted before any outsourcing. The call was about to end and Jeff Stackhouse asked that Plaintiff remain on the line after others had left. Stackhouse then asked Plaintiff if he could be the one to address DGS Publications about the application. Plaintiff told him that was fine as long as he kept Procurement updated. Despite the clear difference, it was soon thereafter that Jeff Gensemer/DGS, Publications wrote advocating that Spaceworx get the award.

101. Having had the conversations with both Char Riley/DGS, Procurement (Commodity Specialist for furniture contracts) and her supervisor Adrienne Dickerson (Commodity Manager), Plaintiff was frustrated by the monetary waste involved and the fact that Jeff Stackhouse, as well as the House and Senate representatives were pushing for Spaceworx, with its clearly inflated number. Notwithstanding, Adrienne Dickerson, Ms. Riley's supervisor

told Ms. Riley, who relayed the information to Plaintiff, not to pursue the matter further or ask any further questions as the Spaceworx pod was what the Senate and House wanted.

102. Upon information and belief, the overpriced Spaceworx pod was delivered and installed on or about July 29, 2026.

Overall Factual Conclusion

103. Based only in part by what has previously been pled herein, in Plaintiff's experience, key senior management either do not understand, or care to understand, Commonwealth procurement requirements. This continues, as upon information and belief, Plaintiff's replacement does not possess her procurement experience or understanding of the current procurement systems.

104. Plaintiff learned that the process was oftentimes violated by front loading procurements with a verbal waiver prior to FARM proceeding with the formal process. Upon information and belief, that is still occurring along with the breaking up of phases to each be under the fifty thousand dollar ($50,000.00) amount where Request for Quotes should have been issued in the first instance from an Invitation to Qualify, along with a Statement of Work document having been prepared.

105. Plaintiff repeatedly reported procurement improprieties and waste to supervisors, directors, deputy secretaries, procurement officials, and legal personnel at DGS. These included her procurement counterparts, along with her direct supervisor, Defendant Mike Weges, Defendant Kris Landvater, Defendant McNally, Defendant Ramsay and Catherine Califano (Deputy Secretary of Administration and Real Estate Services).

106. Instead of investigating Plaintiff's concerns, management increasingly restricted information to her, discouraged further inquiry from her, end ran her when it came to information and decisions, and ultimately fired her on Tuesday, March 24, 2026.

107. Plaintiff has learned from a trusted source that the reason for her firing was that "she pissed off" Defendant McNally.

108. Now, on the occasion of subsequent job interviews that Plaintiff has had with Commonwealth agencies, she was advised by a prior colleague that in order to get a job this time, to ***"Be sure not to do here what you did over there..." and to be sure to "Keep your mouth closed this time!"***

109. The Commonwealth's and DGS's final policymakers adopted or ratified the acts described above when it came to treating Plaintiff's complaints and ultimately firing her, rendering those acts the official policy of the Borough for purposes of applicable law, including but not limited to 42 U.S.C. § 1983.

## COUNT I – Commonwealth & DGS Liability Under 42 U.S.C. § 1983 Pursuant to the Monell Doctrine

**Plaintiff vs. all Individuals Named Defendants & the Does**

110. Plaintiff repeats and realleges the preceding allegations as though fully set forth herein.

111. Plaintiff alleges that the individual defendants are liable under 42 U.S.C. § 1983 because the constitutional violations described in this Complaint were caused by official governmental action, the decisions of officials possessing final policymaking authority, governmental custom, and/or governmental ratification.

112. Plaintiff has alleged that the named individual defendants and possibly other John or Jane Doe defendants undertook and possessed authority over significant employment decisions with respect to Plaintiff and that those individual defendants specifically participated in, approved, or ratified the challenged actions complained of herein

113. Plaintiff alleges that the named individual defendants and/or the Does, possessed final authority over significant employment decisions affecting Plaintiff and participated in, approved, or ratified the challenged actions complained of herein.

114. Plaintiff further alleges that those individually named and the Does implemented or carried out the challenged employment decisions pursuant to governmental authority conferred upon them or assumed by them.

115. Simply stated, the decision to fire Plaintiff was reviewed, approved, or knowingly permitted by officials authorized to establish DGS and/or Commonwealth policy in this area, rather than some isolated conduct by a subordinate government employee, particularly given the number of instances where Plaintiff complained sought to uphold proper procurement practices.

116. Plaintiff contends that all individual defendants named failed to ensure compliance with the contractual, statutory, and procedural protections applicable to Plaintiff's employment before firing her.

117. Plaintiff alleges that the requisite policymakers had actual or constructive knowledge of the challenged firing action and deliberately failed to prevent, correct, or reverse them.

118. Plaintiff further alleges that discovery will identify the meetings, communications, executive-session discussions (to the extent discoverable), directives, and

official actions through which the Commonwealth/ DGS approved or ratified the conduct challenged herein.

119. Plaintiff alleges that the constitutional injuries described in this Complaint were the moving force behind the damages she sustained and were caused by official governmental action within the meaning of *Monell.*

120. Plaintiff seeks a declaration by this Court of *Monell* liability and Plaintiff seeks all relief permitted by law.

## COUNT II VIOLATION OF FIRST AMENDMENT FREEDOM OF SPEECH UNDER 42 U.S.C. SEC. 1983

**Plaintiff vs. All Individuals Named Defendants & the Does**

121. Plaintiff repeats and realleges the preceding allegations as though fully set forth herein.

122. The named individual defendants, together with the Doe defendants, have discriminated against the Plaintiff by depriving her of her rights, privileges and immunities secured by the Constitution and laws of the United States as applied to the States pursuant to the Fourteenth Amendment. by retaliating against her for not keeping her mouth shut in seeking to enforce applicable procurement requirements, and damaging her reputation and employment prospects.

123. In addition, with respect to the aforementioned allegations of procurement abuse and fraud, Plaintiff has incurred the anger of the named individual defendants and Does who retaliated against Plaintiff; actions raising the issue and questions amounting to reports of fraud, possible theft, falsification of official records and systemic misconduct within DGS. Plaintiff's

protests constituted speech on matters of profound public concern, including misuse of taxpayer funds, possible criminal conduct, and the integrity of DGS, a public institution.

124. In criticizing an environment of tolerance for the conduct Plaintiff criticized contrary to established procedure, Plaintiff spoke as a citizen and not pursuant to her ordinary job duties because:

- reporting misconduct and fraud to superiors implicates independent legal and ethical obligations;

-the conduct reported involved potential criminal violations of Pennsylvania law;

-such reporting exceeded routine administrative duties and implicated public accountability concerns.

125. Under the applicable balancing test here, Plaintiff's interest in exposing government corruption far outweighs any conceivable government interest in suppressing such speech.

126. Following Plaintiff's protected activity, Defendants took adverse actions sufficient to deter an ordinary person from exercising such speech.

127. The causal connection between Plaintiff's protected conduct and the retaliation is demonstrated by temporal proximity and a pattern of antagonism, including threats, hostility and targeting by the named individual Defendants and/or Does.

128. Plaintiff seeks all relief authorized by 42 U.S.C. § 1983, including compensatory damages, punitive damages, equitable relief, attorney's fees where authorized, costs, and any additional relief permitted by law.

## COUNT III VIOLATION OF FOURTEENTH AMENDMENT RIGHTST TO DUE PROCESS (SUBSTANTIVE AND PROCEDURAL) AND DEPRIVATION OF BOTH PROPERTY AND LIBERTY INTERESTS UNDER 42 U.S.C. SEC. 1983

**Plaintiff vs. All Individuals Named Defendants & the Does**

129. Plaintiff repeats and realleges the preceding allegations as though fully set forth herein.

130. Plaintiff has been subject to discipline without being afforded due process.

131. Plaintiff should be subject to disciplinary action only for "just cause." Moreover, more should have been involved than simply being fired for allegedly "pissing off" Defendant McNally. Instead, Plaintiff has a constitutionally-protected property interest in her continued public employment, rank, and job assignment.

132. To date, Plaintiff has been afforded nothing in the way of proceedings wherein she could clear her good name and confront her accusers.

133. As set forth herein, Plaintiff was unilaterally removed from her position with the attendant stigma without notice, charges, or a meaningful opportunity to be heard prior to the imposition of that discipline.

134. Plaintiff has further been deprived of a protected liberty interest in her reputations and professional standing through the stigmatization attendant to her firing and being placed in a false light.

135. The aforesaid actions by Defendants satisfy the "stigma-plus" doctrine, as Plaintiff has suffered reputational harm combined with tangible employment consequences.

136. Plaintiff seeks all relief authorized by 42 U.S.C. § 1983, including compensatory damages, punitive damages, equitable relief, attorney's fees where authorized, costs, and any additional relief permitted by law

## COUNT IV VIOLATION OF FOURTEENTH AMENDMENT RIGHTS TO EQUAL PROTECTION UNDER 42 U.S.C. SEC. 1983

**Plaintiff vs. All Individuals Named Defendants & the Does**

137. Plaintiff repeats and realleges the preceding allegations as though fully set forth herein.

138. At all relevant times, the individual Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

139. Plaintiff is entitled to the equal protection of the laws under the Fourteenth Amendment.

140. Plaintiff contends that Defendants intentionally treated her differently from similarly situated employees because of her raising objections to procurement improprieties.

141. Plaintiff alleges that her challenged firing were undertaken for unequally based discriminatory and retaliatory reasons rather than legitimate governmental objectives.

142. Officials possessing final authority over Plaintiff's employment approved, ratified, or knowingly permitted the challenged conduct.

143. Plaintiff alleges that she has suffered the loss of professional opportunities, injury to reputation, emotional distress, and economic damages as a direct result of the unequal treatment alleged herein.

144. Plaintiff seeks all relief authorized by 42 U.S.C. § 1983, including compensatory damages, punitive damages, equitable relief, attorney's fees where authorized, costs, and any additional relief permitted by law.

## COUNT V – VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER LAW , 43P.S. § 1421, *et seq*

**Plaintiff vs. Defendants Commonwealth of Pennsylvania and its Department of General Services**

145. Plaintiff repeats and realleges the preceding allegations as though fully set forth herein.

146. Pennsylvania law provides Plaintiff with relief pursuant to the Pennsylvania Whistleblower Law, 43 P.S. § 1421, *et seq.* (“Whistleblower Law”).

147. The Commonwealth and its DGS are subject to the Pennsylvania Whistleblower Law as Plaintiff’s “Employer” – directly paying her as such.

148. By repeatedly complaining about and criticizing procurement violations and bringing it to her superiors’ attention, Plaintiff repeatedly made what turned out to be a good faith reports of waste and wrongdoing as set forth hereinabove. This engendered the wrath of and retaliation against Plaintiff, resulting in her firing.

149. Plaintiff comes within the definition of a “whistleblower,” a protected class of employees under this law, as “a person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person’s superiors, to an agent of the employer or to an appropriate authority.”

150. Further, Plaintiff fits within the protection of the Whistleblower Law, as she was retaliated against as a result of engaging in protected conduct. Specifically, §1423(a) thereof provides that “No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employer’s compensation, terms, conditions, location or privileges of

employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste."

151. By reason of the actions exercised by the individual defendants and others on behalf of Defendant DGS and Commonwealth against Plaintiff, she is entitled to all legal and equitable remedies available under the Pennsylvania Whistleblower Law.

## PRAYER FOR OVERALL RELIEF

WHEREFORE, Plaintiff Nicole Moyer respectfully requests that this Honorable Court enter judgment in Plaintiff's favor and grant relief as is requested and set forth in Counts I through V above.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby requests and demands a jury trial.

Respectfully Submitted,

**MARK D. SCHWARTZ, ESQUIRE**
By: _/s/ Mark D. Schwartz
Mark D. Schwartz, Esquire (Pa ID #30527)
P.O. BOX 330
BRYN MAWR, PA 19010
Telephone: 610 525-5534
Markschwartz6814@gmail.com

**LORRAINE C. HARMER, ESQUIRE***

Lorraine C. Harmer, Esquire (Pa ID #337242)
Harmer Law Firm, LLC
P.O. Box 21
Cochranville, PA 19330
Telephone: 610 255-7113
Lorraine@harmerlawfirm.com

* To be admitted .

Attorneys for Plaintiff Nicole Moyer